JUDGE STEIN

14 CV 6741

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---

UNCOMMON CONTENT PARTNERS LLC, )
) Index No.
Plaintiff, )
) COMPLAINT
- against - ) AND JURY DEMAND
)
TALAMASCA, INC., PHARRELL WILLIAMS, )
)
Defendants. )
---

RECEIVED
AUG 20 2014
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Uncommon Content Partners LLC, by and through its attorneys, Rosenberg & Giger P.C., as and for its Complaint against defendants Talamasca, Inc. and Pharrell Williams, alleges and avers as follows:

## NATURE OF THE ACTION

1. In this action, plaintiff Uncommon Content Partners, LLC ("UCP"), a creator and producer of original filmed content for television, internet and other media, seeks redress for defendants' breaches of UCP's clear contractual rights in connection with a new talk show entitled "Artst Tlk" (the "Series"), for which defendant Pharrell Williams ("Williams"), the well-known producer and recording artist, is contractually obligated to appear as on-air host. Through an agreement dated March 23, 2012 (the "Agreement"), defendant Talamasca, Inc. furnished the services of Williams for an initial season of the Series and also granted UCP an exclusive, irrevocable option to engage Williams for a second season. Following UCP's production and release on YouTube of the first season of the Series, UCP exercised its option to secure Williams's services for season two, but defendants have refused to honor their contractual commitments, citing as an excuse - - albeit one with no legal consequence or validity - - that Williams's pre-existing contractual obligations to UCP conflict with the exclusivity provisions of

an agreement that Williams recently entered into to appear as a coach on the popular televised singing competition "The Voice."

2. Defendants' breach of the Agreement by failing to honor UCP's option for the second season has caused significant damage to UCP, which invested over $1 million in production of the initial season of the Series and, with the knowledge of defendants, was engaged in serious negotiations concerning a license agreement with a cable television network and corporate sponsorship for the Series. Defendants' refusal to honor Williams's contractual commitment to participate in season two of the Series has not only interfered with those business opportunities, but has destroyed the value of UCP's significant investment in the first season of the Series. UCP brings the present action to obtain legal redress for the substantial damage it has suffered as the direct result of defendants' breaches of the Agreement.

## PARTIES

3. Plaintiff Uncommon Content Partners LLC ("UCP") is a limited liability company organized under the laws of the State of Delaware, with its principle place of business in New York, New York. Through its members, UCP is a citizen of the states of Delaware, New York, New Jersey, Colorado and Connecticut.

4. Defendant Talamasca, Inc. ("Talamasca") is a corporation organized under the laws of the State of Florida, with a principal place of business in Los Angeles, California. Talamasca is a "furnishing company" for defendant Pharrell Williams - - *i.e.*, it executes agreements, such as the Agreement at issue in this action, on Williams's behalf and furnishes his services in connection with such agreements.

5. Defendant Pharrell Williams ("Williams") is resident and citizen of the State of Florida.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that it is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7. This Court has personal jurisdiction over defendants pursuant to CPLR § 302(a), in that defendants have regularly transacted business in this State in connection with the matters and claims at issue in this action and the Agreement at issue was executed in New York. The Court also has personal jurisdiction over defendants pursuant to the terms of the Agreement, in which each party "consents to the jurisdiction of any state or federal court located in the state of New York, County of New York" for the adjudication of disputes arising under the Agreement.

8. Venue is proper in this Court, *inter alia*, pursuant to 28 U.S.C. §§ 1391(a)(1) because the Agreement at issue in this action was executed and performed, in part, within this judicial district. Venue is also proper in this judicial district pursuant to the language of the Agreement quoted in the immediately preceding sentence of this Complaint.

## FACTUAL BACKGROUND

**The Parties' Agreement and the Initial Season**

9. Plaintiff UCP is a creator and producer of original programming content distributed across multiple media platforms, including television and the internet.

10. UCP created, developed and owns all rights in a program entitled "Artst Tlk," which is a unique take on the talk show format that features defendant Williams interviewing other artists, entertainers, writers and creative professionals in an intimate setting. As

3

contemplated by the Agreement, Artst Tlk is "a talk show featuring today's and tomorrow's most culturally relevant talents."

11. On or about, and effective "as of" March 23, 2012, UCP entered into the Agreement with defendant Talamasca, which executed the Agreement "f/s/o" defendant Williams, *i.e.*, "for the services of" Williams.

12. On or about March 26, 2012, in connection with and to induce UCP to enter into the Agreement, Williams signed a document entitled "Inducement," in which he personally agreed, *inter alia*, to "perform and comply with all of the terms, covenants, conditions and obligations of the Agreement" and confirmed that, in the event of a breach of the Agreement by Talamasca or Williams, UCP may "join [Williams] in any action against [Talamasca] without being first required to resort to or exhaust any rights or remedies against [Talamasca]."

13. Pursuant to the Agreement, UCP engaged Williams "to provide services as an on-camera host and talent" in connection with multiple episodes of Artst Tlk (the "Series"). The Agreement obligated Williams, *inter alia*, to provide the contractually mandated services for an "Initial Season" consisting of twelve to eighteen half-hour episodes.

14. The Agreement also provided UCP with an "exclusive" and "irrevocable" option to engage Williams to provide the contractually mandated on-air hosting services with respect to an additional season of the Series, consisting of up to eighteen additional half-hour episodes (the "Additional Season Option").

15. The Additional Season Option was "exercisable by written notice to [Talamasca] on or before the earlier of six (6) months following the date on which the last ordered episode of the Initial Season is first made publicly available on the YouTube Service or (ii) ten (10) months

after completion of [Williams's] services in connection with the last ordered episode of the Initial Season."

16. The Agreement obligated the parties to "work together in good faith to create a production schedule . . . for the Initial Season . . . that does not conflict with [Williams's] prior professional commitments," and, in connection therewith, mandates that defendants "shall promptly notify [UCP] of the schedule of all of Williams's prior professional commitments as previously scheduled."

17. With respect to the Additional Season, the Agreement provided that the production schedule was to be established by the "good faith efforts" of the parties "in the same manner as set forth . . . with respect to the Initial Season" - - *i.e.*, by Williams's providing UCP with his schedule of "prior professional commitments" followed by the parties' good faith efforts to agree upon an acceptable production schedule.

18. Pursuant to the Agreement, upon the parties' mutual acceptance of a production schedule, Williams's services in connection with the Series "shall be first priority and not subject to any other professional commitments of [Williams] during the time period mutually scheduled."

19. Consistent with the forgoing, shortly following the execution of the Agreement, the parties commenced shooting pursuant to a joint production schedule for the Initial Season in or about July of 2012 and concluded shooting for the Initial Season in or about November of 2013.

20. The Agreement notes that it is "currently anticipated that the Series will initially . . . be made available through the YouTube Service" on the Internet. Episode One of the Series was published on YouTube in or about October of 2012. Subsequently, UCP made available

5

eleven additional episodes of the Initial Season on YouTube, at a rate of approximately one episode per month, until, in December of 2013, it published on YouTube Episode Twelve, the final episode of the Initial Season.

21. The Initial Season of the Series on YouTube attracted more than 1.7 million views across all twelve episodes and showcased conversations between Williams and well-known artists ranging from film director Spike Lee and visual artist Jeff Koons to musical artist Usher and actor Leonard Nimoy.

22. The Agreement specifically confirms that UCP "owns all right, title and interest in and to the Series throughout the world, in perpetuity, in any and all media now known or hereafter devised, free of any claim whatsoever . . . and [UCP's] affiliates, assignees and licensees shall have the sole, exclusive and unlimited rights in perpetuity, throughout the world in all languages, to reproduce, distribute, transmit, display, exhibit, license, advertise, promote and otherwise use and exploit the Series, or any portion or derivative thereof, in any manner or medium (now or hereafter known) as [UCP] shall determine in its sole discretion." In addition, pursuant to the terms of the Agreement, all of Williams's services rendered pursuant to the Agreement, and the programming content resulting therefrom, constitute "works made for hire" commissioned by UCP in which UCP possesses "all right title and interest."

23. As defendants were aware, from the initial execution of the Agreement UCP's ultimate goal was to license its rights in the Series to a television network for broadcast in a traditional television format. On repeated occasions prior to the present dispute, defendants confirmed their knowledge of and expressed support for this goal, in part because such a television license agreement would increase the net profits of the Series, of which Williams was entitled to a significant portion under the Agreement.

6

24. Beginning in or about March of 2013, based on its unequivocal contractual right to do so, and with defendants' knowledge and encouragement, UCP devoted significant time, effort and resources to identifying and pursuing opportunities for the broadcast of the Series on television and, in connection therewith, attempting to secure corporate sponsorships and other sources of funding for the production of the second season of the Series.

25. In its discussions with television networks and corporate sponsors, UCP represented - - and it was a central component of the proposed agreements - - that UCP possessed a contractual option to an additional season of the Series, beyond the Initial Season already released on YouTube. Thus, UCP's rights in Williams's services past the production of the Initial Season were particularly critical to UCP's ability to secure television broadcast and sponsorship agreements for the Series.

26. UCP was able to offer to television networks broadcast rights beyond the Initial Season because it possessed the right, exercisable at UCP's sole discretion, to the Additional Season Option, as described in more detail above.

**Williams Signs a Conflicting Agreement with The Voice**

27. By early 2014, following the publication of the last episode of the Initial Season on YouTube, UCP was engaged in serious, detailed discussions with television networks and corporate sponsors concerning the possible license of the Series for television broadcast and UCP's rights in respect of the Additional Season of the Series. Williams and his management team were aware of these discussions, including that UCP was representing to these networks and potential sponsors that Williams was contractually obligated to appear in the Series during the Additional Season.

28. By March of 2014, UCP was engaged in serious, high level negotiations both a specific cable television network and a potential corporate sponsor to help provide the funding to bring the Series to television. With respect to the proposed television licensing agreement, as of early March of 2014, UCP was negotiating with the CEO of a cable network to broadcast the Initial Season during a specific, available time slot. In addition, the proposed agreement contemplated an exclusive option for the network to broadcast the Additional Season of the Series. UCP kept Williams and his representatives apprised of the details of these negotiations.

29. On March 31, 2014, while UCP was seeking to close the proposed television licensing and corporate sponsorship agreements alleged above, major television network NBC issued a press release announcing that Williams would be appearing in a prominent role as a celebrity "coach" on season 7 of the popular televised singing competition "The Voice."

30. UCP was unaware that Williams and his representatives had been negotiating for his appearance on The Voice, only learning about it, for the first time, one day prior to the dissemination of the NBC press release. Specifically, on March 30, 2014, Williams's personal manager, Caron Veazey, informed the principal managing member of UCP, Kevin Law, that Williams had signed an agreement with NBC committing Williams to appear on The Voice (the "Voice Agreement"). During this call, Ms. Veazey revealed that the Voice Agreement would effectively derail the contemplated production of the Additional Season of the Series because Williams had agreed to a provision barring him from participating in the filming of any non-scripted programming during a contractually-defined exclusivity period lasting until 18 months following the broadcast of the last episode of the second season of The Voice for which Williams appeared as a judge (the "Voice Exclusivity Provision"). Upon information and belief, the Voice

Exclusivity Provision would prohibit Williams from participating in the production of the Additional Season of the Series until late 2017 or 2018.

31. Defendants informed UCP that NBC would not permit Williams to participate in an Additional Season of the Series until after the Voice Exclusivity Provision had expired, *i.e.*, as late as 2018.

32. In this regard, on or about April 9, 2014, Ms. Veazey, acting on behalf of defendants, wrote to UCP and advised UCP of "NBC's unwillingness to allow Pharrell to continue with Season two of ARTST TLK," averring that, as a result, Williams "is unable to do season two of the show until the NBC exclusivity period concludes."

33. Also on April 9, 2014, Williams wrote to Mr. Law of UCP, expressing his incredulity, despite UCP's $1,000,000-plus investment in the First Season of the Series and its ongoing negotiations to license the Series to a television network and secure sponsorship agreements, that UCP would not abandon its clear contractual rights in respect of Williams's services, writing, "Holding me to a contract that prohibits The Voice exclusivity requirement? It's the Voice!"

34. In response, UCP confirmed to the defendants that UCP's option for a second season of the Series was a critical component of its proposed television licensing and corporate sponsorship agreements and that Williams's failure to honor the Additional Season Option would jeopardize UCP's contemplated business relationships.

35. By letter dated April 17, 2014, UCP provided formal notice to Talamasca and Williams that UCP "is exercising its Additional Season Option to engage [Williams] to render services for the Additional Season (i.e., Season 2) of the Series, in accordance with Paragraph 3 of the Agreement" (the "Option Notice").

36. The Option Notice confirmed that UCP would be contacting Williams "to discuss the scheduling for production and your services for the Additional Season." The Option Notice concluded, "We are very confident that we can work out a schedule for 'Artst Tlk' that will not interfere with your schedule for 'The Voice'."

**Defendants' Breach of the Agreement**

37. Defendants responded to the Option Notice, through their counsel, by letter dated April 29, 2014. In that responsive letter, ignoring the clear language of the Agreement, defendants asserted, without any legal basis, that UCP "does not possess television rights in the series," and requested that UCP's counsel "prevent" UCP from soliciting an agreement for the broadcast of the Series on television.

38. Contrary to their previously stated position that Williams would not be available for the Additional Season until the Voice Exclusivity Provision had expired, and in a transparent pretext, defendants also demanded in their response to the Option Notice that UCP propose a production schedule for defendants' "review and consideration." This demand was not only contrary to the Agreement's requirement that defendants promptly notify UCP of Williams's "previously scheduled professional commitments" in furtherance of the parties' establishment of the production schedule, but was a subterfuge, as defendants knew, and had previously advised UCP, that NBC would not permit Williams to participate in the production and broadcast of the Additional Season of the Series during his exclusivity period with NBC.

39. Over the course of the next three months, UCP attempted to arrive at a business solution with defendants to resolve the conflict between UCP's clear, pre-existing contractual right to the Additional Season Option, as set forth in the Agreement, and Williams's claimed obligations under the subsequently agreed-to Voice Exclusivity Provision.

40. During UCP's discussions with defendants, in *sub silentio* recognition that their initial position in response to the Option Notice would place defendants in default of their clear obligations under the Agreement, defendants presented a constantly shifting array of disingenuous arguments and unfounded demands, all designed to protect Williams's contractual exclusivity obligations to The Voice at the expense of his pre-existing obligations to UCP.

41. In this regard, and without limitation, from early May through late July of 2014, defendants alternatively took the conflicting positions: (a) that the Additional Season must be released on the internet prior to any broadcast on television, despite the absence of any such provision in the Agreement; (b) that UCP was somehow prohibited from licensing the Series to a television network or obtaining financing for the production of the Additional Season from a television network, despite the Agreement's clear provisions to the contrary; and (c) that, while UCP perhaps could license the Series or obtain production financing from a television network, defendants would require UCP to accept a number of extra-contractual terms and requirements as a condition of defendants' compliance with their existing obligations under the Agreement.

42. In late July of 2014, following months of discussions between the parties, defendants demanded that, as a condition of Williams honoring his obligations in respect of the Additional Season Option, UCP must (a) insert new language into the Agreement granting Williams new and unprecedented veto power over all "sponsorship, endorsement, cross promotion or product placement opportunities in connection with the Series" and (b) excise a provision of the Agreement providing UCP with valuable, exclusive rights of "first negotiation" and "last refusal" with respect to certain other talk show programs produced or developed by Williams.

43. UCP had no obligation to accept, and in fact rejected, the unilateral terms imposed by defendants as a condition of their performance of their existing obligations under the Agreement.

44. As a result of defendants' refusal to honor the Additional Season Option pursuant to the Agreement, UCP was forced to halt its negotiations concerning the propose television licensing and corporate sponsorship agreements alleged above, and it has been unable to confirm or provide any assurances to television networks or potential corporate sponsors that Williams will participate in the production of the Additional Season of the Series. Thus, defendants' actions have destroyed UCP's ability to consummate any broadcast or sponsorship agreements for the Series.

45. UCP expended - - and, as the direct result of defendants' conduct, has lost - - in excess of $ 1 million in connection with its development and production of the Series. UCP would not have invested this money - - or, indeed, have produced the Initial Season of the series at all - - if it had known that Williams would refuse to honor the Additional Season Option.

46. In addition, as the direct result of defendants' refusal to honor their contractual obligations, UCP has lost substantial revenues and other sums due to its inability to produce and exploit the Additional Season of the Series, license the Series to a network for broadcast or obtain sponsorship rights.

## COUNT I
## BREACH OF CONTRACT

47. Plaintiff incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

48. As alleged above, pursuant to the Agreement, UCP is contractually entitled to engage Williams's services for the Additional Season by exercising the Additional Season Option.

49. UCP validly exercised the Additional Season Option pursuant to the Agreement.

50. Defendants have breached the Agreement by, *inter alia*, (a) refusing to honor Williams's obligations to participate in the Additional Season unless UCP agrees to new terms and conditions granting additional rights to Williams and waiving valuable rights of UCP under the Agreement; and (b) refusing to follow the Agreement's procedure for determining the production schedule of the Additional Season.

51. Defendants were aware that - - as in fact occurred - - their contractual breaches in refusing to honor the Additional Season Option would destroy UCP's ability to enter into the contemplated television licensing agreement and obtain corporate sponsorship for the Series.

52. As a direct result of defendants' contractual breaches, UCP has incurred significant losses in connection with the Series, including both out-of-pocket expenses and lost revenues from its inability to exploit the Series beyond the publication of the Initial Season on YouTube.

53. Plaintiff has been damaged by defendants' aforesaid contractual breaches in an amount to be determined at trial, but in no event less than $ 1 million.

## PRAYERS FOR RELIEF

WHEREFORE, based upon the foregoing allegations and averments, plaintiff Uncommon Content Partners LLC respectfully demands judgment against defendants Talamasca, Inc. and Pharrell Williams, as follows:

A. Awarding plaintiff compensatory damages in an amount to be determined at trial;

B. Awarding plaintiff its attorney's fees and costs incurred in connection with this action; and

C. Granting such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable.

Dated: August 20, 2014
New York, New York

**ROSENBERG & GIGER P.C.**

By: _____
John J. Rosenberg
Matthew H. Giger
Brett T. Perala
250 Park Avenue, 12th Floor
New York, NY 10177
(646) 494-5000

*Attorneys for Plaintiff*