UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

_____

UNCOMMON CONTENT PARTNERS LLC,    )
    )
                           Plaintiff,    )
    )
          - against -    )
    )
TALAMASCA, INC., PHARRELL WILLIAMS,    )
    )
                        Defendants.    )
_____)

Index No. 14-cv-6741 (SHS)

**SECOND AMENDED
COMPLAINT AND
<u>JURY DEMAND</u>**

Plaintiff Uncommon Content Partners LLC, by and through its attorneys, Rosenberg &
Giger P.C., as and for its Second Amended Complaint against defendants Talamasca, Inc. and
Pharrell Williams, alleges and avers as follows:

## <u>NATURE OF THE ACTION</u>

1.      In this action, plaintiff Uncommon Content Partners, LLC ("UCP"), a creator and
producer of original filmed content for television, internet and other media, seeks redress for
defendants' breaches of UCP's clear contractual rights and of their related duty of good faith and
fair dealing, in connection with the parties' agreement (the "Agreement") for the production of a
talk show entitled "Artst Tlk" (the "Series").  Through the Agreement, defendant Talamasca, Inc.
furnished the services of defendant Pharrell Williams ("Williams"), the well-known producer
and recording artist, as the on-air host for the initial season of the Series and also granted UCP an
exclusive, irrevocable option to engage Williams in that same capacity for a second season of the
Series.  Following UCP's production and release on YouTube of the first season of the Series,
UCP exercised its option to secure Williams's services for season two, but defendants have
refused to honor their contractual commitments, citing as an excuse - - albeit one with no legal
consequence or validity - - that Williams's pre-existing contractual obligations to UCP conflict

with the exclusivity provisions of an agreement that Williams recently entered into to appear as a coach on the popular televised singing competition "The Voice." Thus, as alleged in greater detail below, defendants breached the Agreement and their duty of good faith and fair dealing under New York law through intentional conduct that undermined UCP's contractual option rights in the second season of the Series and otherwise defeated UCP's right and entitlement to receive the benefits of the parties' Agreement.

2.    Defendants' breaches have caused substantial damage to UCP, which invested in excess of $1 million in the production of the initial season of the Series and, with the knowledge of defendants, was engaged in serious negotiations concerning a license agreement with a cable television network and corporate sponsorship for the Series. Defendants' refusal to honor Williams's contractual commitment to participate in season two of the Series has not only derailed those business opportunities, but has destroyed the value of UCP's significant investment in the first season of the Series, causing UCP significant losses. UCP brings the present action to obtain legal redress for the substantial damage it has suffered as the direct result of defendants' breaches of the Agreement and their related duty of good faith and faith dealing.

## PARTIES

3.    Plaintiff Uncommon Content Partners LLC ("UCP") is a limited liability company with its principal place of business in New York, New York. As a result of the citizenship of its members, UCP is a citizen of New York, New Jersey, Colorado and Connecticut.

4.    Defendant Talamasca, Inc. ("Talamasca") is a corporation organized under the laws of the State of Delaware, with a principal place of business in Los Angeles, California. Talamasca is a "furnishing company" for defendant Pharrell Williams - - *i.e.*, it executes

agreements, such as the Agreement at issue in this action, on Williams's behalf and furnishes his services in connection with such agreements.

5.      Defendant Pharrell Williams ("Williams") is resident and citizen of the State of Florida.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that it is an action between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over defendants pursuant to CPLR § 302(a), in that defendants have regularly transacted business in this State in connection with the matters and claims at issue in this action and the Agreement at issue was executed in New York. The Court also has personal jurisdiction over defendants pursuant to the terms of the Agreement, in which each party "consents to the jurisdiction of any state or federal court located in the state of New York, County of New York" for the adjudication of disputes arising under the Agreement.

8.      Venue is proper in this Court, *inter alia*, pursuant to 28 U.S.C. §§ 1391(b)(2) because the Agreement at issue in this action was executed and performed, in part, within this judicial district. Venue is also proper in this judicial district pursuant to the language of the Agreement quoted in the immediately preceding paragraph of this Complaint.

## FACTUAL BACKGROUND

### The Parties' Agreement and the Initial Season

9.      Plaintiff UCP is a creator and producer of original programming content distributed across multiple media platforms, including television and the internet.

10.     UCP created, developed and owns all rights in the Series, *i.e.*, a program entitled "Artst Tlk," which is a unique take on the talk show format that features defendant Williams interviewing other artists, entertainers, writers and creative professionals in an intimate setting. As contemplated by the Agreement, Artst Tlk is "a talk show featuring today's and tomorrow's most culturally relevant talents."

11.     On or about, and effective "as of" March 23, 2012, UCP entered into the Agreement with defendant Talamasca, which executed the Agreement "f/s/o" defendant Williams, *i.e.*, "for the services of" Williams.  A true and correct copy of the Agreement, with certain financial information redacted therefrom, is attached hereto as Exhibit A.

12.     On or about March 26, 2012, in connection with and to induce UCP to enter into the Agreement, Williams signed a document entitled "Inducement," in which he personally agreed, *inter alia*, to "perform and comply with all of the terms, covenants, conditions and obligations of the Agreement" and confirmed that, in the event of a breach of the Agreement by Talamasca or Williams, UCP may "join [Williams] in any action against [Talamasca] without being first required to resort to or exhaust any rights or remedies against [Talamasca]."

13.     Pursuant to the Agreement, UCP engaged Williams "to provide services as an on-camera host and talent" in connection with multiple episodes of the Series.  The Agreement obligated Williams, *inter alia*, to provide the contractually mandated services for an "Initial Season" consisting of twelve to eighteen half-hour episodes.

14.     The Agreement also provided UCP with an "exclusive" and "irrevocable" option to engage Williams to provide the contractually mandated on-air hosting services with respect to a second season of the Series, consisting of up to eighteen additional half-hour episodes (the "Additional Season Option").

4

15.     The Additional Season Option was "exercisable by written notice to [Talamasca] on or before the earlier of six (6) months following the date on which the last ordered episode of the Initial Season is first made publicly available on the YouTube Service or (ii) ten (10) months after completion of [Williams's] services in connection with the last ordered episode of the Initial Season."

16.     The Agreement obligated the parties to "work together in good faith to create a production schedule . . . for the Initial Season . . . that does not conflict with [Williams's] prior professional commitments," and, in connection therewith, mandates that defendants "shall promptly notify [UCP] of the schedule of all of Williams's prior professional commitments as previously scheduled."

17.     With respect to the Additional Season, the Agreement provided that the production schedule was to be established by the "good faith efforts" of the parties "in the same manner as set forth . . . with respect to the Initial Season" - - *i.e.*, by Williams's first providing UCP with his schedule of "prior professional commitments" followed by the parties' good faith collaboration upon a mutually acceptable production schedule.

18.     The parties' "agreement on a mutually acceptable production schedule" is expressly identified as a "condition precedent" to UCP's obligations under the Agreement.

19.     Pursuant to the Agreement, upon the parties' mutual acceptance of a production schedule, Williams's services in connection with the Series "shall be first priority and not subject to any other professional commitments of [Williams] during the time period mutually scheduled."

20.     Consistent with the forgoing, shortly following the execution of the Agreement, in or about July of 2013, the parties commenced shooting pursuant to a joint production schedule

for the Initial Season, and concluded shooting for the Initial Season in or about November of 2013.

21.     The Agreement notes that it is "currently anticipated that the Series will initially . . . be made available through the YouTube Service" on the Internet.  Episode One of the Series was published on YouTube in or about October of 2012.  Subsequently, UCP made available eleven additional episodes of the Initial Season on YouTube, at a rate of approximately one episode per month, until, in December of 2013, it published on YouTube Episode Twelve, the final episode of the Initial Season.

22.     The Initial Season of the Series on YouTube attracted more than 1.7 million views across all twelve episodes and showcased conversations between Williams and well-known artists ranging from film director Spike Lee and visual artist Jeff Koons to musical artist Usher and actor Leonard Nimoy.

23.     The Agreement specifically confirms that UCP "owns all right, title and interest in and to the Series throughout the world, in perpetuity, in any and all media now known or hereafter devised, free of any claim whatsoever . . . and [UCP's] affiliates, assignees and licensees shall have the sole, exclusive and unlimited rights in perpetuity, throughout the world in all languages, to reproduce, distribute, transmit, display, exhibit, license, advertise, promote and otherwise use and exploit the Series, or any portion or derivative thereof, in any manner or medium (now or hereafter known) as [UCP] shall determine in its sole discretion."  In addition, pursuant to the terms of the Agreement, all of Williams's services rendered pursuant to the Agreement, and the programming content resulting therefrom, constitute "works made for hire" commissioned by UCP in which UCP possesses "all right title and interest."

24.     As defendants were aware, from the initial execution of the Agreement UCP's ultimate goal was to license its rights in the Series to a television network for broadcast in a traditional television format.  On repeated occasions prior to the present dispute, defendants confirmed their knowledge of and expressed support for this goal, in part because such a television license agreement would increase the net profits of the Series, of which Williams was entitled to a significant portion under the Agreement.

25.     Beginning in or about March of 2013, based on its unequivocal contractual right to do so, and with defendants' knowledge and encouragement, UCP devoted significant time, effort and resources in identifying and pursuing opportunities for the broadcast of the Series on television and, in connection therewith, attempting to secure corporate sponsorships and other sources of funding for the production of the Additional Season of the Series.

26.     In its discussions with television networks and corporate sponsors, UCP represented - - and it was a central component of UCP's proposed agreements with those entities - - that UCP possessed the contractual option to an additional season of the Series featuring Williams as the on-air host, beyond the Initial Season already released on YouTube.  Thus, UCP's rights in Williams's services past the production of the Initial Season were particularly critical to UCP's ability to secure television broadcast and sponsorship agreements for the Series.

27.     In that regard, UCP was able to offer to television networks broadcast rights beyond the Initial Season because it possessed the right, exercisable at UCP's sole discretion, to the Additional Season Option, as described in more detail above.

**Williams Signs a Conflicting Agreement with NBC**

28.     By early 2014, following the publication of the last episode of the Initial Season on YouTube, UCP was engaged in serious, in-depth discussions with television networks and

corporate sponsors concerning the possible license of the Series for television broadcast and UCP's rights in respect of the Additional Season of the Series. Williams and his management team were aware of these discussions, including that UCP was representing to these networks and potential sponsors that Williams was contractually obligated to appear in the Series during the Additional Season.

29.    By March of 2014, UCP was engaged in serious, high level negotiations with both a specific cable television network and a potential corporate sponsor to help provide the funding to bring the Series to television. With respect to the proposed television licensing agreement, as of early March of 2014, UCP was negotiating with the CEO of a cable network to broadcast the Initial Season during a specific, available time slot. In addition, the proposed agreement with this cable network contemplated an exclusive option for the network to broadcast the Additional Season of the Series. UCP kept Williams and his representatives apprised of the details of these negotiations.

30.    On March 31, 2014, while UCP was seeking to close the proposed television licensing and corporate sponsorship agreements described above, major television network NBC issued a press release announcing that Williams would be appearing in a prominent role as a celebrity "coach" on season 7 of the popular televised singing competition "The Voice."

31.    UCP was unaware that Williams and his representatives had been negotiating for his appearance on The Voice, only learning about it, for the first time, one day prior to the dissemination of the NBC press release. Specifically, on March 30, 2014, Williams's personal manager, Caron Veazey, informed the principal managing member of UCP, Kevin Law, that Williams had signed an agreement with NBC committing Williams to appear on The Voice (the "Voice Agreement"). During this call, Ms. Veazey revealed that the Voice Agreement would

8

derail the contemplated production of the Additional Season of the Series because Williams had agreed with NBC to a provision barring him from participating in the filming of any non-scripted programming during a contractually-defined exclusivity period lasting until 18 months following the broadcast of the last episode of the second season of The Voice for which Williams appeared as a judge (the "Voice Exclusivity Provision").  Upon information and belief, the Voice Exclusivity Provision prohibits Williams from participating in the production of the Additional Season of the Series until late 2017 or 2018.

32.     In addition to the foregoing, defendants specifically informed UCP that NBC would not permit Williams to participate in an Additional Season of the Series until after the Voice Exclusivity Provision had expired, *i.e.*, as late as 2018.

33.     In this regard, on or about April 9, 2014, Ms. Veazey, acting on behalf of defendants, wrote to UCP and advised UCP of "NBC's unwillingness to allow Pharrell to continue with Season two of ARTST TLK," averring that, as a result, Williams "is unable to do season two of the show until the NBC exclusivity period concludes."

34.     Also on April 9, 2014, Williams wrote to Mr. Law of UCP, expressing his incredulity, despite UCP's $1,000,000-plus investment in the First Season of the Series and its ongoing negotiations to license the Series to a television network and secure sponsorship agreements, that UCP would not abandon its clear contractual rights in respect of Williams's services, writing, "Holding me to a contract that prohibits The Voice exclusivity requirement? It's the Voice!"

35.     In response, UCP confirmed to the defendants that UCP's option for the Additional Season of the Series was a critical component of its proposed television licensing and

corporate sponsorship agreements and that Williams's failure to honor the Additional Season

Option would jeopardize UCP's contemplated business relationships.

36.     By letter dated April 17, 2014, UCP provided formal notice to Talamasca and

Williams that UCP "is exercising its Additional Season Option to engage [Williams] to render

services for the Additional Season (i.e., Season 2) of the Series, in accordance with Paragraph 3

of the Agreement" (the "Option Notice").

37.     The Option Notice confirmed that UCP would be contacting Williams "to discuss

the scheduling for production and your services for the Additional Season." The Option Notice

concluded, "We are very confident that we can work out a schedule for 'Artst Tlk' that will not

interfere with your schedule for 'The Voice'."

### Defendants' Defeat UCP's Option Rights and Breach the Agreement and the Implied Covenant of Good Faith and Fair Dealing

38.     Defendants responded to the Option Notice, through their counsel, by letter dated

April 29, 2014. In that responsive letter, ignoring the clear language of the Agreement,

defendants asserted, without any legal basis, that UCP "does not possess television rights in the

series," and requested that UCP's counsel "prevent" UCP from soliciting an agreement for the

broadcast of the Series on television. On information and belief, defendants took this unfounded

position as a result of the direct conflict between UCP's pre-existing rights under the Agreement

and the exclusivity provision of Williams's later agreement with The Voice.

39.     Ignoring their previously stated position that Williams would not be available for

the Additional Season until the Voice Exclusivity Provision had expired, and in a transparent

pretext, defendants also demanded in their response to the Option Notice that UCP propose a

production schedule for defendants' "review and consideration." This demand was not only

contrary to the Agreement's requirement that *defendants* promptly notify UCP of Williams's

"previously scheduled professional commitments" in furtherance of the parties' establishment of the production schedule, but was a subterfuge, as defendants knew, and had previously advised UCP, that NBC would not permit Williams to participate in the production of the Additional Season of the Series during his exclusivity period with NBC.

40.     Defendants' request that UCP propose a production schedule "in a vacuum" - - *i.e.*, without any information concerning Williams's availability - - was confirmatory that defendants did not intend to negotiate a production schedule in good faith, because the Voice Exclusivity Provision prohibited Williams from appearing pursuant to *any* schedule for the Additional Season of the Series and thus proscribed *any* production schedule for the Additional Season.

41.     Over the course of the next three months, UCP engaged in discussions with defendants in an effort to reach a solution to the intractable conflict between UCP's clear, pre-existing contractual right to Williams' appearance in the Additional Season, as set forth in the Agreement, and Williams's obligations under the subsequently agreed-to Voice Exclusivity Provision.

42.     During UCP's discussions with defendants, in *sub silentio* recognition that their initial position in response to the Option Notice would place defendants in default of their clear obligations under the Agreement, defendants presented a constantly shifting array of disingenuous arguments and unfounded demands, all designed to protect Williams's contractual exclusivity obligations to The Voice at the expense of his pre-existing obligations to UCP.

43.     In this regard, and without limitation, from early May through late July of 2014, defendants alternatively took the conflicting positions:  (a) that the Additional Season must be released on the internet prior to any broadcast on television, despite the absence of any such

provision in the Agreement; (b) that UCP was somehow prohibited from licensing the Series to a television network or obtaining financing for the production of the Additional Season from a television network, despite the Agreement's clear provisions to the contrary; and (c) that, while UCP perhaps could license the Series or obtain production financing from a television network, defendants would require UCP to accept a number of extra-contractual terms and requirements as a condition of defendants' compliance with their existing obligations under the Agreement.

44.     In late July of 2014, following months of communications between the parties - - none of which concerned Williams's schedule of prior professional commitments - - defendants demanded that, as a condition of Williams honoring his obligations in respect of the Additional Season Option, UCP must (a) insert new language into the Agreement granting Williams new and unprecedented veto power over all "sponsorship, endorsement, cross promotion or product placement opportunities in connection with the Series" and (b) excise a provision of the Agreement providing UCP with valuable, exclusive rights of "first negotiation" and "last refusal" with respect to certain other talk show programs produced or developed by Williams.

45.     UCP had no obligation to accept, and in fact rejected, the unilateral terms imposed by defendants as a condition of the performance of their obligations under the Agreement in respect of the Additional Season.

46.     As a result of defendants' refusal to honor the Additional Season Option pursuant to the Agreement, UCP was forced to halt its negotiations concerning the proposed television licensing and corporate sponsorship agreements alleged above, as it was unable to confirm or provide any assurances that Williams would participate in the production of the Additional Season of the Series.  Thus, UCP was not able to enter into those agreements, and has also lost additional agreements and business opportunities as a result of defendants conduct alleged

above.  In fact, defendants' actions have destroyed UCP's ability to consummate any broadcast or sponsorship agreements for the Series.

47.     UCP expended - - and, as a direct result of defendants' conduct, has lost - - in excess of $ 1 million in connection with its development and production of the Series.  UCP would not have invested these funds - - or, indeed, have produced the Initial Season of the series at all - - if it had known that Williams would breach his obligations under the Agreement in respect of the Additional Season.

48.     In addition, as the direct result of defendants' refusal to honor their contractual obligations, UCP has lost substantial revenues and other sums due to its inability to produce and exploit the Additional Season of the Series, license the Series to a network for broadcast or obtain sponsorship rights.

## COUNT I
## BREACH OF CONTRACT

49.     Plaintiff incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

50.     As alleged above, pursuant to the Agreement, UCP is contractually entitled to engage Williams's services for the Additional Season by exercising the Additional Season Option.

51.     UCP validly exercised the Additional Season Option pursuant to the Agreement and has otherwise performed all of its obligations under the Agreement, including by attempting to work with defendants in good faith to develop a production schedule.

52.     Defendants breached the Agreement by, *inter alia*, (a) refusing to participate in good faith in the negotiation of a production schedule for the Additional Season, as a result of the

conflict between the production of the Additional Season and defendants' obligations under the Voice Exclusivity Provision; (b) refusing to follow the Agreement's procedure for determining the production schedule of the Additional Season by failing to "promptly notify" UCP concerning Williams's schedule of "prior professional commitments"; and (c) ultimately refusing to honor Williams's obligation to participate in the Additional Season unless UCP agreed to new terms and conditions granting additional rights to Williams and waiving valuable rights of UCP under the Agreement.

53.     Defendants were aware that - - as in fact occurred - - their contractual breaches would destroy UCP's ability to enter into the contemplated television licensing agreement and obtain corporate sponsorship for the Series and would otherwise defeat UCP's right and ability to exploit the Series as contemplated by the Agreement.

54.     As a direct result of defendants' contractual breaches, UCP has incurred significant losses in connection with the Series, including both out-of-pocket expenses and lost revenues from its inability to exploit the Series beyond the publication of the Initial Season on YouTube.

55.     Plaintiff has been damaged by defendants' aforesaid contractual breaches in an amount to be determined at trial, but in no event less than $ 1 million.

## COUNT II
## BREACH OF IMPLIED COVENANT

56.     Plaintiff incorporates by reference in their entirety the preceding paragraphs of this Complaint, as if fully set forth herein.

57.     In the alternative to Count I, but without waiver of or prejudice to the claim asserted therein, defendants breached the implied covenant of good faith and fair dealing implicit

in all New York contracts by taking acts - - *e.g.*, agreeing to the Voice Exclusivity Provision - - that defeated UCP's right under the Agreement to Williams' participation in the Additional Season of the Series and, as such, UCP's benefits and entitlements under the Agreement.

58.      In this regard, albeit without limitation, by agreeing to the Voice Exclusivity Clause (1) defendants caused Williams to be unavailable to appear in the Additional Season of the Series and thus rendered any effort by UCP to establish a production schedule for the Additional Series entirely futile; and (2) caused defendants to be unable to provide the contractually mandated services for the Additional Season.

59.      Defendants conduct destroyed the right of UCP to receive the fruits of the Agreement - - including, without limitation, the production and monetization of the Additional Season and UCP's contemplated television licensing agreement and related corporate sponsorship for the Series - - and caused UCP to incur significant losses in connection with the Series, as alleged above.

60.      Plaintiff has been damaged by defendants' aforesaid breaches of the covenant of good faith and fair dealing in an amount to be determined at trial, but in no event less than $ 1 million.

## PRAYERS FOR RELIEF

WHEREFORE, based upon the foregoing allegations and averments, plaintiff

Uncommon Content Partners LLC respectfully demands judgment against defendants

Talamasca, Inc. and Pharrell Williams, as follows:

A.   Awarding plaintiff compensatory damages in an amount to be determined at trial;

B.   Granting such other and further relief as this Court deems just and appropriate.


## JURY DEMAND

Plaintiff demands a trial by jury on all issues and claims so triable.

Dated:   August 19, 2015
         New York, New York

                                    **ROSENBERG & GIGER P.C.**

                                    By: _____
                                        John J. Rosenberg
                                        Matthew H. Giger
                                        Brett T. Perala
                                        250 Park Avenue, 12th Floor
                                        New York, NY  10177
                                        (646) 494-5000

                                    *Attorneys for Plaintiff*

# EXHIBIT A



**UNCOMMON CONTENT PARTNERS LLC**
c/o Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attn: Marc Chamlin, Esq.

Date:  As of March 23, 2012

Talamasca, Inc. f/s/o Pharrell Williams
c/o Davis Shapiro Lewit & Hayes, LLP
689 Fifth Ave., 5th Floor
New York, NY 10022
Attn: Steven G. Shapiro, Esq.

Re:    Artst Tlk

Dear Pharrell:

This letter confirms the terms of the agreement (the "**Agreement**") between Talamasca, Inc. ("**Lender**") f/s/o Pharrell Williams ("**you**" or "**Artist**") and Uncommon Content Partners LLC ("**Producer**"), with respect to the initial season of a proposed program series, currently known as "Artst Tlk" (the "**Series**"), followed by Producer's option to order an additional season of the Series.  The Series will be a talk show featuring today and tomorrow's most culturally relevant talents.

Subject to all terms hereof, it is currently anticipated that the Series will initially appear as part of a programming service currently entitled The Conversation Channel (the "**Channel**") that will be made available through the YouTube Service (as defined below) and that will be programmed by Producer and feature the Series and other talk show programs created by or on behalf of Producer.  The Series may appear on or be made available through other components of the Google Services (as defined below).  The "**YouTube Service**" means the service known as YouTube provided from the YouTube website (including all top level domains and subdomains thereof), including all mirror and derivative sites, all replacements or successor versions thereof, and all international versions thereof, as accessed by web-browser (including via PC, mobile, and TV devices) and/or application. The "**Google Services**" means the YouTube Service and other websites, products, services, and applications operated by Google, Inc. ("**Google**") or an affiliate.

1.    <u>CONDITIONS PRECEDENT</u>.  All of Producer's obligations under this Agreement are expressly conditioned upon the following ("**Conditions Precedent**"): (a) your execution and delivery to Producer of this Agreement and the exhibits attached hereto, including the attached Inducement, which is hereby incorporated by reference; (b) your compliance with all applicable governmental requirements including, but not limited to, completing, signing and delivering to Producer all required tax and immigration forms as provided to you (as applicable), (c) Artist's satisfaction of the requirement set forth in Paragraph 8(b)(i) hereof, and (d) Artist's and



Producer's agreement on a mutually acceptable production schedule for Artist's services hereunder (as further set forth in Paragraph 2 hereof).

2.    INITIAL SEASON.  Subject to satisfaction of the Conditions Precedent set forth above, Producer hereby engages you (subject to Producer's rights of suspension and/or termination as provided herein) to provide services as on-camera host and talent in connection with the initial season of the Series, which is currently anticipated to consist of twelve (12) half (1/2)-hour episodes (the "Initial Season"); it being agreed that Producer shall have the right to increase the Initial Season order at any time with incremental orders for additional episodes, up to a maximum of eighteen (18) Initial Season episodes.  Artist's services for the Initial Season shall commence on a date reasonably designated by Producer and Artist (pursuant to the following sentence), and shall continue until completion of all of Artist's required services in connection with the Initial Season.  Artist and Producer will work together in good faith to develop a production schedule (including mutually agreed times and places) for the Initial Season (and thereafter for the Additional Season if Producer exercises the Additional Season Option) that does not conflict with Artist's prior professional commitments (in connection therewith, Artist shall promptly notify Producer of the schedule of all of Artist's prior professional commitments as previously scheduled at such time).  Upon Artist's and Producer's mutual acceptance of such production schedule for the Series, the services to be rendered by Artist hereunder in accordance with such schedule shall be first priority and not subject to any other professional commitments of Artist during the time period mutually scheduled.

3.    ADDITIONAL OPTION.  Producer will have one (1) exclusive (subject to the terms and conditions hereof), irrevocable (unless this Agreement is terminated pursuant to the terms hereof), successive, dependent option (the "Additional Season Option") to engage you to provide services for up to one (1) additional season of the Series, which shall consist of a maximum of eighteen (18) half (1/2)-hour episodes (the "Additional Season"); it being agreed that if the initial order of episodes for the Additional Season is less than such maximum, Producer shall have the right to increase such Additional Season order at any time with incremental orders for additional episodes, up to such maximum.  Artist shall be obligated to render services for the Additional Season commencing on a date mutually agreed upon by Artist and Producer, and shall continue until completion of all of Artist's required services in connection with the Additional Season (subject to Producer's and Artist's good faith efforts to create a mutually agreeable production schedule, in the same manner as set forth above with respect to the Initial Season).  The Additional Season Option shall be exercisable by written notice to you on or before the earlier of six (6) months following the date on which the last ordered episode of the Initial Season is first made publicly available on the YouTube Service, or (ii) ten (10) months after completion of Artist's services in connection with the last ordered episode of the Initial Season.  The Initial Season and the Additional Season may each be referred to herein as a "Season".  The production period for each Season may not be longer than an eighteen (18) month period.

4.    SERVICES.

       (a)    In consideration for the compensation set forth in Paragraph 5 below and the terms and conditions hereof, you shall materially render all services customarily rendered by the host and key on-camera talent of a talk show program, including without limitation: allowing



Producer reasonable access to film all aspects of your interactions with your guests that are or may be featured in any episode of the Series, performing interview segments on-air; reasonably attending meetings; attending and participating in rehearsals; and participating in mutually determined publicity interviews, stills sessions (provided that you will provide to Producer at least ten (10) photo stills and a biography of you, all of which are acceptable to Producer, no later than promptly following your execution of this Agreement, provided that your inadvertent failure to provide such materials shall not constitute a breach of this Agreement) and mutually determined promotional appearances.   Without limiting the foregoing, but subject to any potential conflicts of which Artist informs Producer under Paragraph 8(b) below, Artist's services hereunder shall include services in connection with product integration, and Artist hereby agrees to participate in and cooperate with all product integration provided by Producer or its designee and previously approved by Artist in each instance; provided, that Artist shall not be required to directly endorse any products or services without Artist's prior written consent in each instance. Artist's services will be rendered either alone or in cooperation with other persons in such manner as Producer may reasonably direct, under the reasonable instructions and in strict accordance with the policies, protocols, controls and schedules established by Producer or Producer's authorized representatives and at the times and places set forth in the mutually agreed upon production schedule.   You shall use commercially reasonable efforts to make yourself available to complete all production and other services required by Producer in accordance with the terms hereof.  It is currently anticipated that each episode will require an average of 1 to 2 days of services.  You acknowledge and agree that Producer shall maintain creative control over the Series and all episodes and exploitations thereof.  All services rendered by you shall be rendered in a conscientious manner to the best of your ability and with full regard to the policies established by Producer.  Notwithstanding anything to the contrary contained herein, (i) any consent, permission or other approval that Producer is entitled to grant or that Artist is required to obtain from Producer under any provision of this Agreement shall not be unreasonably withheld or delayed and shall be understood to mean Producer's prior, written consent, permission or approval, and (ii) any consent, permission or other approval that Artist is entitled to grant or that Producer is required to obtain from Artist hereunder shall not be unreasonably withheld or delayed by Artist and shall be understood to mean  Artist's prior, written consent, permission or approval; provided, that e-mail shall satisfy the "written" requirement for purposes of this sentence.

(b)     Without limiting the foregoing, you shall be available to participate in up to five (5) mutually approved press and promotional interviews/appearances per Season to promote the Series, the Channel, Producer (and/or its affiliates), Google (and/or its affiliates) and/or the Google Services (collectively, the "**Promotional Events**"), at no additional charge to Producer other than as expressly set forth herein, it being understood that Producer shall be responsible for all agreed costs and expenses in connection therewith.  All Promotional Events will be arranged by Producer subject to Artist's approval.  Producer will advise Artist of the nature of each Promotional Event and the date and time of Artist's requested appearance. Artist's participation in Promotional Events shall be subject to Artist's prior professional commitments and Artist's approval in each instance.

(c)     Without limiting the foregoing, Artist's services hereunder shall include services in connection with the production of new and/or enhanced material related to the Series intended for exhibition in short segments, as mutually determined or as otherwise reasonably required,

subject to Artist's prior professional commitments.  If required by Producer, Artist shall also perform in "custom commercials" (i.e., in-show commercials), provided that such commercials shall be subject to Artist's prior approval in each instance and Artist shall not be required to directly endorse any products or services without Artist's prior consent.  If required by Producer, and solely in connection with the promotion of the Series, Artist shall also perform in standard non-commercial billboards, standard non-commercial openings, closings, lead-ins to and lead-outs from commercials, bridging lines, voice-overs and pick-up shots, and Artist shall participate in and contribute to social networking websites (e.g., Twitter, Facebook, Google+, Tumblr, etc.) and similar social media in Artist's reasonable discretion.  Without limiting Producer's rights herein, Producer shall have the exclusive and irrevocable right to use the results and proceeds of Artist's services in one or more additional episodes, including, without limitation, reunion, "making of," or recap or "best-of" episodes, and if Artist is required to perform any services in connection with such additional episodes that Artist has not otherwise agreed to provide under this Agreement, Artist will be entitled to receive additional compensation for such services to be negotiated in good faith  Any services that Artist is required to perform under this Paragraph 4(c) outside of production periods for the Series shall be subject to Artist's professional availability.  Notwithstanding anything to the contrary contained herein, Artist shall not be required to render any services under this Paragraph 4(c) that would conflict with Artist's obligations under any of Artist's pre-existing agreements, including, without limitation, with Artist's record label, provided that Artist shall notify Producer of any such conflicts reasonably in advance of the applicable services hereunder.

(d)     Artist will execute all releases and other documents consistent with the terms and conditions hereof that Producer may reasonably require in connection with Artist's services for the Series.

5.     COMPENSATION.  Provided you fully complete all required, material services and you are not in material breach, and subject to Paragraphs 16 and 17 hereof, Producer shall pay you the following in full consideration of all services rendered and the Additional Season Option and rights granted to Producer hereunder:

(a)     ████████ per episode of the Initial Season, with payment for the first  episode payable promptly following the execution hereof, with the balance payable within fifteen (15) business days following completion of all production related services for each additional episode.

(b)     In connection with the Additional Season, the per episode fee shall be subject to an increase of ████████ and payments shall be made in accordance with the payment schedule specified in Paragraph 5(a) above.

(c)     Notwithstanding the foregoing, for each Season of Artist's services ordered hereunder, unless Artist is terminated hereunder due to default, incapacity or force majeure, Artist shall be entitled to minimum guaranteed compensation in an amount equal to the aggregate of the applicable per episode fee set forth above in this Paragraph 5 for three (3) episodes (the "Minimum Guarantee").

(d)  "Series Net Profits" are defined as all advertising revenues actually received by or credited to Producer from Google from the distribution or other exploitation of the Series ("Google Ad Revenues"), as well as all other revenues actually received by or credited to Producer from the exploitation of the Series in any other media, including without limitation all forms of television (collectively with the Google Ad Revenues, "Gross Revenues"), less (i) any and all distribution fees and expenses and/or agency and/or sales commissions that may be payable by Producer to third parties in connection with the Series, (ii) any production costs and expenses payable to third parties incurred and/or funded by Producer (in place of, or in addition to, production funding provided by Google) with respect to the Series, (iii) all other direct, out-of-pocket costs and expenses paid or payable by Producer (excluding Producer's overhead costs and expenses) to third parties in connection with the Series, (iv) a fixed overhead fee of ██████ per Season of the Series, and (v) ████ of Gross Revenues as an additional overhead charge for the ongoing costs incurred by Producer for creation, promotion, marketing, accounting, administration, etc.  Solely with respect to Series episodes for which Artist fully renders services hereunder, Artist shall be entitled to receive a sum equal to ████ of ██████ of any Series Net Profits that are derived from Google Ad Revenues, and a sum equal to ████ of ████ of any Series Net Profits that are derived from any other Gross Revenues.  Producer shall consult with Artist with respect to any exploitation of the Series other than exploitation thereof on or through the Google Services, provided that in the event of any disagreement, Producer's decision shall control and be final.  Notwithstanding the foregoing, in the event Producer wishes to license or otherwise dispose of the Series for distribution on a cable television network that is a direct competitor of KarmaloopTV during the term of Artist's agreement with KarmaloopTV, then Artist shall have the right to approve such license or other disposition.  For purposes of the foregoing sentence, KarmaloopTV is a multi-platform broadband programming network which was launched in 2008, with plans to expand in 2012 to a 24-hour cable television network. KarmaloopTV provides an inside look at all elements that fuel cutting edge "Verge Culture" – the intersection of lifestyle, music and fashion. The KarmaloopTV.com online video network features exclusive programming targeted to youth culture, providing content which highlights the intersection of lifestyle, music and fashion, technology and social activism, including political content, celebrity interviews and informational segments on the hottest new streetwear brands.

(e)  Any amounts payable by Producer to you under Paragraph 5(d) above shall be paid within ninety (90) days after the end of each calendar quarter in which any Series Net Profits are received by or credited to Producer, and such payment shall be accompanied by a statement setting forth the calculation of such Net Profits for such calendar quarter and your share thereof.

(f)  You shall have the right, upon reasonable notice, during regular business hours and without unnecessarily interfering with the conduct of Producer's business, at your sole cost and expense, to audit Producer's books and records no more than once annually and no more than once with respect to any accounting statement, to the extent that they pertain to Series Net Profits and solely for the purpose of verifying the accuracy of Producer's calculation of your share thereof.  If you fail to make an audit claim within six (6) months after the commencement of an audit, then any accounting statement rendered for the period audited will be deemed accurate and uncontestable, and you shall be deemed to have waived the right to collect any deficiency.  Notwithstanding the foregoing, any accounting statement that is not objected to



within two (2) years after such statement has been rendered will be deemed accurate and uncontestable.

(g)     You will not, and will not authorize or encourage any third party to, directly or indirectly generate queries, impressions of or clicks on any ad(s) or obtain access to the Series or any other content on the Channel through any automated, deceptive, fraudulent or other invalid means, including but not limited to through repeated manual clicks, the use of robots or other automated query tools and/or computer generated search requests, and/or the fraudulent use of other search engine optimization services and/or software.

(h)     All compensation payable to Artist hereunder is payable (i) provided that Artist fully completes all required material services hereunder and is not in default hereunder, and (ii) subject to the suspension or termination of Artist as further set forth herein.   Other than as expressly set forth herein, Artist shall not be entitled to any compensation from or participation in any exploitation of the Series or the Channel (or any ancillary rights thereto) or of the rights granted to Producer hereunder.

6.     EXPENSES / TRAVEL.

(a)     You agree that all expenses you incur in rendering services hereunder will be borne by you, except for those expenses specified in this paragraph or for which you have obtained Producer's prior written approval.  In the event that Producer requires your physical presence at a location that is more than one hundred (100) miles outside of your principal residence in Miami, Florida, Producer shall provide you with a per diem in the amount of ▓▓▓▓▓▓▓ for each day that your presence is required; first class hotel room for each night that your presence is required; first   class air travel; and first class ground transportation (if and as necessary).

(b)     If requested by Artist, Producer shall provide reasonable hair and make-up personnel to Artist for each day of principal photography in which Artist participates, subject to and in accordance with the production budget for the applicable Season of the Series.

7.     ARTIST'S NAME / LIKENESS.   You agree that Producer, and its affiliates, licensees (including Google, and any other references herein to Producer's licensees shall be understood to include Google) and assignees shall have the right to use, reproduce, exhibit, distribute, broadcast, display and publish your name, approved likeness, voice, performance and approved biographical material in and in connection with the Series, as well as for the purpose of advertising and/or promoting the Series (and, solely to the extent your name, approved likeness, voice, performance and approved biographical material is incorporated into episodes of the Series), Producer (and/or any of Producer's affiliates), the Channel, Google (and/or its affiliates), the Google Services and/or any other program service, licensee, distributor or sponsor of the Series or Channel, in perpetuity throughout the world, in any manner or media now known or hereafter devised, for no additional compensation; provided such use will not constitute an endorsement of any product or service other than the Series, Producer (and/or any of Producer's affiliates) and the Channel.



8.   **LIMITED EXCLUSIVITY.**

(a)   Commencing on the date of this Agreement, during the period of your services hereunder (including any option periods) and thereafter until the earlier of six (6) months following the date on which the last ordered episode of the Series is first made publicly available on the YouTube Service, or (9) months after completion of Artist's services in connection with the last ordered episode of the Series (the "**Limited Exclusivity Period**"), Artist will not, without Producer's prior consent (not to be unreasonably withheld), render services as a host, co-host or principal on-camera talent for any non-scripted talk-show program in any media for which the concept and format are substantially similar to the concept and format of the Series. For purposes hereof, the "concept and format" of the Series is a talk show featuring today and tomorrow's most culturally relevant talents.   For the avoidance of doubt, home shopping programming which may feature interview components shall not be deemed to be substantially similar to the concept and format of the Series.   For the avoidance of doubt, Producer acknowledges and agrees that Artist has an agreement with Google with respect to a channel on the Google Services operated by Artist in the same manner as the Channel.

(b)   So that conflicts with any major sponsors of the Series and/or the Channel can be avoided and pursuant to Producer's agreement with Google, (i) promptly following Artist's and Producer's full execution of this Agreement, Artist will provide Producer with a list of all products or services for which Artist renders endorsement or similar services, and will notify Producer of any other potential conflicts with potential advertisers or sponsors of the Series and/or Channel, and (ii) Artist will give Producer reasonable advance written notice in the event Artist intends to endorse or render services in connection with any other product or service thereafter during the Limited Exclusivity Period.

(c)   Artist's services hereunder shall be rendered on an in-person, first priority basis during all required production periods, subject to paragraph 2 hereof.  Any uncured breach of any term of this Paragraph 8 shall be a material breach of this Agreement.

9.   **UNION STATUS.**  You acknowledge that Producer is not a party to any collective bargaining agreement with any guild or union which may claim jurisdiction over the services to be rendered hereunder and that Producer will have no obligation with respect to Artist's status as a guild or union member or for any payments which may be required by any such guild or union.

10.   **WORK FOR HIRE; OWNERSHIP OF SERIES.**

(a)   You acknowledge and agree that your services hereunder, and the results and proceeds thereof (collectively, "**Work**"), constitute a "work made for hire" (for the purpose of U.S. copyright law), which has been specially ordered or commissioned by Producer. Accordingly, Producer is the author of the Work, automatically upon its creation, and shall own all right, title and interest in and to such Work (including, without limitation, all copyrights and all renewals and extensions of such copyrights), with the right to use, alter, add to, take from, and otherwise change the Work in any manner that Producer may determine, in Producer's sole discretion, provided that Producer shall not alter your name, likeness, voice, performance or other attributes in an intentionally derogatory manner.  If under any applicable law the Work is not deemed a work made for hire, then to the fullest extent allowable and for the full term of

protection otherwise accorded to you under such applicable law, you hereby irrevocably assign and transfer to Producer all of your right, title and interest in and to such Work. To the fullest extent allowable under any applicable law, you exclusively and irrevocably waive or assign to Producer your so-called "moral rights" or "droit moral" (or any similar rights) which you may now or later have in the Work. You agree to execute any documents and do any other acts as may be reasonably required by Producer or Producer's successors, licensees or assigns to further evidence or effectuate Producer's rights as set forth in this Agreement. You acknowledge and agree that Producer owns all right, title and interest in and to the Series throughout the world, in perpetuity, in any and all media now known or hereafter devised, free of any claim whatsoever by you or any third party deriving any rights from you, and that Producer and its affiliates, assignees and licensees shall have the sole, exclusive and unlimited rights in perpetuity, throughout the world in all languages, to reproduce, distribute, transmit, display, exhibit, license, advertise, promote and otherwise use and exploit the Series, or any portion or derivative thereof, in any manner or medium (now or hereafter known) as Producer shall determine in its sole discretion, but subject to the terms and conditions hereof.

(b)    Notwithstanding the foregoing, to the extent the Work includes any musical composition(s) that you perform in connection with your services hereunder or any master recording made in connection therewith (other than any musical composition that is specifically commissioned by Producer for the Series, subject to good faith negotiation of the terms for any such commission and the full execution of a separate agreement between the parties hereto with respect thereto), such musical composition(s) and/or master recording(s) shall not be owned by Producer. To the extent you perform any such musical composition(s) during the rendition of on-camera services hereunder, to the extent the same are owned and/or controlled by you, you hereby grant (or you hereby agree to use commercially reasonable efforts to cause any applicable music publisher to grant) to Producer a gratis synchronization license to include such musical composition in the applicable episode of the Series or other applicable video materials created hereunder and to distribute, use and otherwise exploit such musical composition(s) solely as incorporated into such episode or other materials in any and all media now known or hereafter devised, throughout the world and in perpetuity, without further obligation to you or any third party, subject to any limitations on the exploitation of such episode or other materials otherwise set forth herein, and provided that Producer shall not claim any share of any public performance fees or royalties that are required to be paid in connection with any such exploitation.

11.    RIGHT OF FIRST NEGOTIATION/LAST REFUSAL FOR SUBSEQUENT SERIES WITH ARTIST. If, from the date hereof until the earlier of twelve (12) months following the date on which the last ordered episode of the Series is first made publicly available on the YouTube Service, or eighteen (18) months after completion of Artist's services in connection with the last ordered episode of the Series (the "First Negotiation Period"), Artist desires to produce or develop another talk show program of any kind in any media for which Artist will render services as a host, co-host, principal on-camera talent (excluding, for the avoidance of doubt home shopping programming which may otherwise feature interview components) (each, an "Other Project"), Artist shall give Producer written notice of that intention and Artist will negotiate exclusively with Producer in good faith for up to thirty (30) days with respect to the terms and conditions for each proposed Other Project, provided that if.no agreement is reached between Producer and Artist during this exclusive negotiating period with respect to the applicable Other Project, Artist may thereafter enter into negotiations with third parties with

respect to the Other Project, provided that Artist shall not enter into any verbal or written agreement with a third party with respect to the Other Project without first offering to Producer the opportunity to enter into an agreement on the same terms and conditions on which Artist proposes to enter into an agreement with such third party (the "Offer"). After receipt of the Offer, Producer shall have ten (10) business days within which to decide whether to refuse or accept the Offer. In accepting the Offer, Producer need only accept those terms and conditions of the Offer that are material and relate solely to the Other Project and that can be satisfied by any individual as sufficiently as by any other individual. If Producer does not exercise its right of acceptance within such ten (10) business day period and if Artist fails to enter into an agreement with such third party on the material terms of the Offer or on terms more favorable to Artist, then Producer's right of refusal shall revive and shall apply to each and every further offer or offers received or made by Artist with respect to the applicable Other Project during the First Negotiation Period. Producer's right of refusal described above shall also apply (on the same terms set forth above) in the event that, within the First Negotiation Period, Artist receives from a third party an offer for an Other Project that is not initiated by Artist. Notwithstanding the foregoing, any potential Other Project is subject to the terms of Paragraph 8(a) hereof.

12.   **PAYOLA / PLUGOLA.**  You acknowledge that you have been advised that it is a federal criminal offense to (a) give or agree to give any member of the production staff, anyone associated in any manner with a program, promotion or commercial or any representative of the program service or network any portion of your compensation or anything else of value for arranging Artist's appearance therein, or (b) accept or agree to accept anything of value, other than your compensation, for services on a program, promotion or commercial to promote any product, service or venture on the air, or use any prepared material containing such a promotion where you know the writer received consideration for it. You shall not accept or pay, or agree to accept or pay any such consideration in contravention of these requirements. Any breach hereof shall be a material breach of this Agreement.

13.   <u>REPRESENTATIONS AND WARRANTIES; RELEASE.</u>

(a)   You represent and warrant that (i) except for any material Producer provides to you, the Work (including, without limitation, all ideas or materials of any nature which you furnish hereunder) will be your original creation and will not violate or infringe any copyright, or to the best of your knowledge, any other rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, (ii) subject to the terms and conditions hereof, you have the full right, power and authority to enter into and completely perform your obligations under this Agreement and to grant all rights herein, (iii) your services and obligations under this Agreement do not and will not violate, interfere with or infringe upon the rights of any third party, including, without limitation, a defamation, libel, slander or violation of any right of privacy or publicity, (iv) in performing all of your services and obligations hereunder, you shall not violate any local, state, federal or other law or regulation, and (v) except as referenced herein there are no rights or commitments of any nature outstanding in favor of any person that would or might impair, interfere with or infringe upon the rights herein granted by you and you have obtained or will obtain all required permission or grants of authority necessary with respect to your obligations hereunder.

(b)     You understand that, during the performance of on-camera services in connection with the Series, you and/or your guests may reveal and/or relate information about you of a personal, private, intimate, surprising, defamatory, disparaging, embarrassing or unfavorable nature, and that may be factual and/or fictional.  Producer shall not be obligated to evaluate the truth of statements made by you or third parties in the Series.  You acknowledge and agree that Producer shall have the right, subject to the terms and conditions of this Agreement, (i) to use such information in the Series as edited by Producer in its sole discretion, and (ii) to broadcast and otherwise exploit the Series containing any such information.  You hereby agree not to sue and irrevocably and unconditionally indemnify, release, waive and forever discharge Producer, its licensees (including Google) and assigns, and their respective parents and related companies, subsidiaries (whether or not wholly-owned), affiliates, divisions, and past, present and future officers, agents, representatives, employees, successors and assigns, jointly and individually (hereinafter collectively referred to as "Releasees", which for the avoidance of doubt shall not include your guests on the Series), from any and all liabilities, claims and demands of any kind or nature, whatsoever, in law or equity, whether known or unknown, which you (or your assigns, agents and/or representatives) ever had, now have, or in the future may have against the Releasees arising out of or related to the matters described in this Paragraph 13(b).   You acknowledge that your agreements under this Paragraph 13(b) are on behalf of yourself and your heirs, next of kin, spouse, guardians, legal representatives, employees, executors, administrators, agents, successors and assigns.

14.     INDEMNITY.

(a)     You will indemnify, defend (at Producer's election) and hold harmless Producer, and its officers, partners, agents, employees, affiliates and licensees (including Google and all its affiliates), from and against any and all claims, damages, liabilities, costs and expenses (including reasonable outside attorneys' fees and disbursements) (collectively, "Losses") arising out of any breach of any representation, warranty, covenant or agreement made by you herein, or arising out of your unauthorized acts, willful misconduct, negligence or the use of any materials furnished by you hereunder.

(b)     Producer shall defend, indemnify and hold harmless Artist from and against any and all Losses arising out of (i) any breach of any representation, warranty, covenant or agreement made by Producer herein, or (ii) the development, production, distribution and/or exploitation of the Series and any rights or elements thereof, but excluding any Losses to which Artist's indemnity hereunder applies.

15.     SERVICES UNIQUE.  The parties agree that your services are special, unique, unusual, extraordinary, and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and that Producer, in the event of any breach by you, shall be entitled to seek equitable relief by way of injunction or otherwise, without limiting any other rights or remedies that Producer may have hereunder or at law or equity.  The foregoing shall not limit fact-based defenses available to you with respect thereto.

16.     NO OBLIGATION TO USE.  Nothing herein shall be deemed to obligate Producer to use Artist's services, or the results of such services, in the Series or any episode thereof, or to

produce, release or distribute the Series or any episode thereof, or otherwise to exploit any rights granted hereunder. Producer shall have the right to terminate the services of Artist at any time without cause (i.e., other than for incapacity, default or force majeure), and in such event, Producer shall be relieved of any and all further obligations to Artist hereunder of any kind; provided, however, that in such event, Producer shall remain obligated to pay to Artist any per-episode fees that have fully accrued to Artist hereunder (to the extent not yet paid) for the Season during which Artist's services are terminated (the aggregate amount of which shall be no less than the Minimum Guarantee for such Season), as well as any Series Net Profits earned with respect thereto to the extent vested under the terms and conditions of Paragraph 5 hereof.

17. <u>INCAPACITY, DEFAULT AND FORCE MAJEURE:</u>

(a)    An event of "**incapacity**" will be deemed to exist hereunder if Artist becomes materially incapacitated or prevented from fully performing hereunder or from fully complying with Artist's obligations hereunder by reason of Artist's illness, Artist's mental, physical or other incapacity, or Artist's failure to comply with any obligation hereunder by reason of any cause rendering such non-compliance excusable at law. Artist's failure to qualify for cast insurance at customary rates and/or as may be required by Producer will be deemed an event of incapacity. If Producer or Artist at any time alleges that Artist is, or if Artist will actually be, incapacitated by illness or other incapacity , and thereby prevented from performing hereunder or otherwise fully complying with Artist's obligations hereunder, then Producer may, at Producer's expense, require Artist to submit to medical examination(s) to be conducted by such physician(s) as may be designated by Producer. Artist may, at Artist's expense, cause Artist's own physician to be present at any such examination(s), provided that no delay or interference with such examination(s) results therefrom.

(b)    An event of "**default**" will be deemed to exist hereunder if Artist at any time breaches any material provision of this Agreement, or if Artist at any time fails, refuses or neglects (other than by reason of Artist's incapacity as specified in subparagraph (a) above), to materially comply with Artist's obligations hereunder as required by Producer provided that Artist fails to cure such default within seventy-two (72) hours after Producer notifies Artist of such alleged default.

(c)    An event of "**force majeure**" will be deemed to exist hereunder if, with respect to any program(s) to be produced hereunder, Producer's production operations and/or any normal internet streaming or other transmission operations are materially impaired, hampered, interrupted, prevented, suspended, postponed or discontinued by reason of any war (declared or undeclared), act of public enemy, riot, epidemic, fire, casualty, accident, labor controversy (including without limitation any lockout, walkout, strike, or threat thereof), governmental order or regulation, judicial order or decree (excluding any grant of injunctive relief against Producer)), act of God, failure of technical facilities or substantial impairment  in obtaining facilities, materials, fuel and/or personnel which makes production in accordance with customary or established schedules and practices impracticable.

(d)    If any event of incapacity, default or force majeure occurs at any time during Artist's engagement, then notwithstanding anything to the contrary contained in this Agreement, Artist's engagement pursuant hereto will be automatically suspended. No compensation will

accrue or be payable hereunder during any such period of suspension, except that suspension for incapacity or force majeure will not interfere with Artist's right to receive compensation accrued hereunder with respect to any program(s) produced hereunder with respect to which Artist has rendered all required services prior to the commencement of such suspension.    Producer's payment of any compensation to Artist during any period of suspension will not be deemed a waiver by Producer of any of its rights under this Agreement.  Any suspension hereunder will continue until the cause therefor will have ceased to exist and, with respect to a suspension for incapacity or default, until Artist will have reported to Producer ready, willing and able to perform Artist's obligations hereunder.  Notwithstanding the foregoing, any period of suspension may, at Producer's election, be extended to include such period of time as may be reasonably required by Producer to make preparation for the utilization or resumption of Artist's services. Artist will resume rendering services upon such date following the lifting of any suspension as Producer and Artist may mutually designate.  During any suspension, Artist may render services for any other person or on Artist's own behalf, subject to the provisions of this Agreement relating to Artist's exclusivity hereunder and Artist's services on subsequent series, and subject to Producer's right to require Artist to resume rendering Artist's services hereunder pursuant to the terms and conditions hereof.  Producer may, at its election, lift any suspension at any time upon reasonable notice to Artist prior to the cessation of the cause therefor, except for any suspension caused by Artist's incapacity, and with respect to any suspension caused by an event of force majeure, Producer may, at its election, thereafter reinstate such suspension at any time(s) during the continuation of such event of force majeure.

(e)    Producer will have the right, at its election, by notice given to Artist at any time to extend any other time period hereunder (including without limitation the latest date for the exercise of any option or any other right hereunder) by a period of time equal to or less than the aggregate period(s) of suspension hereunder.

(f)    If any default on the part of Artist occurs hereunder, and Artist does not cure such default within three (3) days following Producer's notice to Artist of such default, Producer will have the right, at Producer's election, to terminate Artist's engagement under this Agreement thereafter.   In the event of Artist's incapacity hereunder, Producer will have the right, at Producer's election, to terminate Artist's engagement under this Agreement at any time after the continuance of such incapacity for more than three (3) consecutive days or for an aggregate of ten (10) days or more during any production period (including the two (2)-week period immediately prior thereto) of Artist's engagement, except that Artist's engagement may be terminated immediately in the event of Artist's death.  If any event of force majeure occurs hereunder, Producer will have the right, at its election, to terminate Artist's engagement under this Agreement at any time after the earlier of:  (i) cancellation of production of all Series episodes that have not yet been produced; or (ii) continuance of such event of force majeure for a period of four (4) consecutive weeks or aggregate periods in excess of six (6) weeks during the period of Artist's employment.  In the event of any termination of Artist's engagement under this Agreement for incapacity or force majeure, Producer will be relieved of any and all further obligations to Artist hereunder of any kind, except that Producer shall remain obligated to pay to Artist any per-episode fees that have fully accrued to Artist hereunder (to the extent not yet paid) for the Season during which Artist's services are terminated, as well as any Series Net Profits with respect thereto to the extent vested under the terms and conditions of Paragraph 5 hereof.  In the event of any termination of Artist's engagement under this Agreement for default, Producer

will be relieved of any and all obligations to Artist hereunder of any kind. Other than the Minimum Guarantee with respect to each Season (which is subject to the terms of Paragraph 5(c) hereof), with respect to the per episode fee payable to Artist under Paragraph 5 hereof, such fee shall not be deemed accrued to Artist hereunder until completion of principal photography for the applicable episode, regardless of when such per episode fee is actually paid to Artist hereunder, and to the extent any such per episode fee is paid to Artist hereunder prior to the date on which it is deemed accrued hereunder, Artist shall return such fee to Producer in the event this Agreement is terminated prior to such accrual date. Neither the suspension nor termination of Artist's engagement under this Agreement will affect any right which Producer may have to recover damages from Artist or to pursue any other rights or remedies at law, in equity or otherwise; nor will any suspension or termination of Artist's engagement under this Agreement affect Producer's ownership of any episode(s) produced hereunder or of any rights granted to Producer hereunder, or Producer's ownership of the results and proceeds of Artist's services hereunder to the extent provided herein or the right to use the foregoing in any and all media now known or hereafter devised, throughout the universe in perpetuity, nor will any suspension or termination of Artist's engagement under this Agreement relieve Artist of any obligations pursuant to any representation or warranty hereunder.

18.   CREDIT. Provided you are not in material breach or default of this Agreement and you fully render all required, material services hereunder, then with respect to each episode of the Series for which Artist renders services hereunder, Artist shall receive an on-screen credit as host of the Series on a separate card, in first position among all on-screen talent credits, in a size at least as large as any other on-screen talent credits. All other aspects of the foregoing credit shall be at Producer's sole discretion.

19.   INSURANCE.

   (a)   Producer may secure life, health, accident, cast, or other insurance covering Artist, or Artist and others, and you shall not have any right, title, or interest in or to such insurance. You shall reasonably assist Producer at Producer's sole cost and expense in procuring such insurance by submitting to Producer's customary examination and by filling out Producer's customary application. In the event any such examination establishes a substantial doubt as to your physical ability to complete your services hereunder, if you fail to appear for such examination at the time and place designated by Producer, or if Producer is unable to procure insurance covering you at normal rates and without special exclusions, such event will be deemed an event of incapacity hereunder.

   (b)   The provisions of this paragraph shall not be construed so as to limit or otherwise affect any of Producer's or your obligations, representations, warranties or agreements hereunder.

20.   LOAN-OUT COMPANY. If Artist is employed through a loan-out company ("Lender"), all references herein to Artist shall be deemed to include Lender, and all payments and other consideration hereunder shall be paid solely to Lender. All rights granted by Artist as set forth in this Agreement shall be deemed granted by Lender as well, and all warranties, agreements, duties, liabilities, obligations and indemnifications given, made and/or assumed by Artist hereunder shall

be deemed given, made and/or assumed by Lender as well.  Lender's and Artist's liability for breach of this Agreement shall be joint and several.

21.   **REMEDIES: WORKERS' COMPENSATION.**

(a)   Any remedies you may have against Producer in connection with the Series and/or this Agreement shall be limited to the right to recover money damages, if any, in an action at law, and you hereby waive any right or remedy in equity, including, without limitation, the right to seek injunctive relief.

(b)   With respect to any injury, illness, disability or death that Artist may suffer during Artist's engagement hereunder (including disability or death consequent thereto whether during or following such period of Artist's engagement hereunder) (an "Event"), which Event is compensable under the applicable Workers' Compensation statute and body of law pertaining thereto (the "**Workers' Compensation Law**"), Artist and Producer agree as follows:

(i)   If Artist's services are being furnished through a loanout company ("Lender"), for the purposes of the Workers' Compensation Law, Producer is Artist's special employer hereunder and Lender is Artist's general employer, as the terms "special employer" and "general employer" are understood for purposes of the Workers' Compensation Law;

(ii)   If the applicability of the Workers' Compensation Law depends upon or is affected by an election by Artist, Artist hereby elects to be bound by the Workers' Compensation Law; and

(iii)   The rights and remedies of Artist and all persons whose rights are derived through Artist (e.g., heirs, dependents, executors, administrators, successors and assigns who may have the right to claim compensation or damages for an Event) shall be governed by the following: (i) such rights and remedies shall be limited to those under the Workers' Compensation Law; (ii) neither Producer nor its agents or employees, general or special, shall have any obligation to Artist by reason of an Event; and (iii) Artist shall indemnify, defend (at Producer's election) and hold harmless Producer, and its officers, partners, agents, employees, affiliates and licensees, from and against any Losses arising out of the assertion of a claim in breach of this provision.

22.   **MISCELLANEOUS.**

(a)   You acknowledge that (i) Artist's services are to be rendered in the capacity of an independent contractor and not as Producer's or the applicable production company's employee, (ii) you shall be fully responsible for any taxes arising from the compensation paid by Producer to you hereunder, and (iii) Artist is not entitled to participate in any benefit plans, program or arrangements which Producer offers to its employees.  You further acknowledge that Artist has no authority to bind, or make any commitments on behalf of Producer, the applicable production company, or their respective subsidiaries or affiliates.

(b)   You acknowledge that in performing pursuant to this Agreement, each party may develop, have access to, or directly or indirectly be exposed to, information of a proprietary and confidential nature about the other (including without limitation its business operations and

activities, strategic plans and financial information) which, if disclosed, could have a negative effect on the other, its subsidiaries and/or affiliated companies. Each party hereto shall keep confidential and not disclose any such information to any third party and, upon termination of this Agreement, each party shall promptly return to the other any confidential information in such party's possession. In addition, the parties hereto shall keep confidential and retain in the strictest confidence and shall not disclose to any third party any of the terms of this Agreement without the prior written consent of one another, except (i) as required by law; (ii) as required to enforce such party's rights hereunder; or (iii) to such party's attorneys, accountants, agents and other professional representatives.

(c)     Artist agrees that Artist shall not publish or release, or authorize the publication or release of, any publicity relating to the Series, or to Artist's services hereunder, (i) prior to Producer's initial press release announcing the Initial Season, and (ii) until Artist has meaningfully consulted with Producer regarding Producer's plans for marketing and publicizing the Series and/or the Channel.  Thereafter, Artist agrees that Artist shall not authorize the publication of any publicity relating to the Series, or to Artist's services hereunder, without Producer's prior written consent, unless said publicity is not inconsistent with Producer's marketing and publicity campaign for the Series and/or the Channel, relates primarily to Artist and/or only incidentally to the Series or Artist's services hereunder and otherwise complies with the terms of this paragraph. Artist agrees that from the date of this Agreement, Artist shall not make, or cause or authorize a third party to make, any statement or communication of any information (whether oral or written, whether you believe such statement to be true or untrue) that disparages or reflects negatively on Producer or Producer's programming, talent in such programming or any of Producer's administrators, affiliates, employees, assigns, or licensees (including without limitation the Channel, Google (and/or its affiliates) or the Google Services, whether prior to or after the expiration or termination of this Agreement.  Artist's breach of the terms of this paragraph will be deemed a material breach of this Agreement.  Producer agrees that from the date of this Agreement, Producer shall not make, or cause or authorize a third party to make, any statement or communication of any information (whether oral or written, whether you believe such statement to be true or untrue) that disparages or reflects negatively on Artist or Artist's talent, whether prior to or after the expiration or termination of this Agreement.  Producer's breach of the terms of this paragraph will be deemed a material breach of this Agreement.

(d)     This is an agreement for Artist's services.  Accordingly, Artist may not assign this Agreement or any of Artist's rights or obligations hereunder without the prior written consent of Producer.  Producer may freely assign this Agreement and any rights and obligations hereunder, provided that Kevin Law shall continue to actively render services in connection the Series, and provided further that Producer shall remain secondarily liable in the event this Agreement is assigned to an entity that is not a network, major studio, mini-studio or other similarly financially responsible entity (including without limitation Google or any affiliate thereof) which assumes Producer's obligations hereunder in writing.

(e)     You acknowledge and agree that you will be responsible for all taxes (other than sales tax or any other tax payable in connection with Producer's distribution, exploitation and exhibition of the Series, if any, for which Producer shall be solely responsible) and other

amounts imposed by any governmental entity solely in connection with the services provided by you hereunder.

(f)     This Agreement may not be amended nor any provision waived except in writing signed by the parties hereto.  This Agreement contains the full understanding of the parties with respect to the subject matter hereof and supersedes any and all previous agreements between the parties hereto.  Each party acknowledges that it is entering into this Agreement in reliance only upon the provisions herein set forth, and not upon any representation, warranty, covenant, agreement, obligation or other consideration not set forth herein, whether oral or written.

(g)     You acknowledge and agree that all provisions of this Agreement are reasonable and valid in all respects, and that if it is determined that any provision hereof, or any part thereof, is invalid or unenforceable, the remainder of the provisions shall not thereby be affected and shall be given full effect, without regard to the invalid portions.

(h)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND WHOLLY PERFORMED THEREIN WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  EACH PARTY HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE STATE OF NEW YORK, COUNTY OF NEW YORK.

(i)     The submission of this Agreement to you or your agent or attorney for review or signature does not constitute an offer to you.  This instrument shall have no binding force or effect until its execution and unconditional delivery by both parties hereto.

(j)     Facsimile and/or PDF signatures shall be deemed original for all purposes.  This Agreement may be executed in counterparts all of which when taken together shall be deemed to constitute one and the same instrument.

(k)     All notices to each party hereunder shall be in writing and shall be addressed to such address as given above or to such other address as either party may hereafter specify by notice duly given.  Any and all written notices required by this Agreement shall be either delivered by hand, mailed (overnight courier or postage prepaid certified or registered mail, return receipt requested) or sent by facsimile transmission.  All such notices shall be deemed delivered as of the date of such delivery, if by hand or overnight courier; three (3) days after the date of such certified or registered mail return receipt, if mailed; or as of the date of acknowledged receipt, if sent by facsimile transmission (or the next business day if not received on a business day).  A copy of all notices to Producer shall be sent to Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154, Attn: Marc Chamlin, Esq. and Stefan Schick, Esq.  A copy of all notices to Artist shall be sent to Davis Shapiro Lewit & Hayes, LLP, 689 Fifth Ave., 5th Floor, New York, NY 10022, Attn: Steven G. Shapiro, Esq.

(l)     The provisions of Paragraphs 5, 7, 8 (to the extent provided therein), 11 (to the extent provided therein), 13, 14, 17, 18 (to the extent provided therein), 20, 21 and 22 shall survive the expiration or termination of this Agreement.

If the foregoing correctly sets forth the terms of the agreement between you and Producer, please sign the enclosed copy of this letter in the space provided below.

Sincerely,

UNCOMMON CONTENT PARTNERS LLC

By: _____
      Name:
      Title:

AGREED AND ACCEPTED:

TALAMASCA, INC. F/S/O PHARRELL WILLIAMS

By: _____
    Pharrell Williams